is 413-0163, Vala and Tameks of Illinois v. Philip Maton, show for the appellant Stephen Coffman, you are he, sir? And for the appellate, David Dury? Yes, Your Honor. Okay, Mr. Coffman, you may proceed. May it please the Court, Counsel. My name is Stephen Coffman, defendant Philip Maton in this case. Pronounce Maton. Yes, Your Honor. First of all, let me acknowledge this is not a court in which discovery disputes should normally be resolved. And I wouldn't be here, I would not have made my record in the court below and solicited the contempt order in order to make this appealable unless this was of absolute critical importance to my client, Mr. Maton. He is in criminal jeopardy. The events which caused him to leave the employee of the Marine Bank in December of 2005, he's still in jeopardy. It's only eight years ago. You didn't claim the Fifth Amendment privilege? Absolutely I have not, Your Honor, because I shouldn't even have to be there at that point. Why are you arguing to us that he's in criminal jeopardy? Why should that matter to us? Because it makes a difference, I believe, Your Honor, in my motivation in soliciting the contempt order. Why is that an issue for us? I'm only explaining, Your Honor, what brought me here. It's not an issue in the case. But Mr. Maton was opposed for over three hours and willingly testified on all relevant topics in the case. But when it came time to testifying about completely unrelated, what we refer to as bank examiner allegations, I instructed him not to answer those questions because they were totally improper, totally irrelevant, not calculated to lead to the discovery of admissible evidence, and they were designed to harass and intimidate him. And I don't use those words. The information regarding those bank examiner allegations that they wanted to quiz Mr. Maton about are already in the hands of the plaintiffs through two very specific bank audits, which went through and detailed all of the activity he was allegedly involved in. The plaintiffs have those examples. He's a defendant himself, is he not? He is. Why would hearing this information from someone else eliminate the need or purpose to hear it from him? Because, well, for one thing, I think the fact that they have the information from somebody else, all of the detailed information from somebody else, shows their motivation in continuing to pursue this issue. Well, isn't an element of their complaint against Mr. Maton that he was involved in defrauding the plaintiff? That's correct. With regard to a 2002-2003 loan relating to a motel here in Springfield, those bank examiner allegations have nothing to do with that. Well, if this is part of a practice, part of an ongoing conspiracy, we're supposed to view this in a light that's favorable to the plaintiff. If the claim is, and it appears to me, that the bank and Mr. Maton was involved in some sort of financial shell game, shifting assets around and trying to cover nefarious conduct in one way by moving assets in another, why wouldn't the entire package be fair game for the plaintiff in an effort to demonstrate this? Because all of that other information regarding other loans is totally irrelevant to the particular issues in this case. There is no allegation of conspiracy. There is an allegation of a pattern of conduct, but the only pattern of conduct that would be relevant in this case would be whether there were similar circumstances in which a marine bank had foreclosed property in its possession and then sold property, quote, at cost. So an allegation of conspiracy would change this context? I don't know. This is not a rhetorical question, Mr. Kaufman. The plaintiff is entitled to amend his complaint at any time for good cause shown, such as information he may have learned from your client to demonstrate that there was a conspiracy. I can only deal, Your Honor, with the case that's in front of me. I can't speculate. But that's the problem with the complaint about discovery being overbrought. We're talking about where it is now and where it could reasonably lead. It's not uncommon in cases we see all the time where a plaintiff brings a complaint involving one or two counts, has further discovery, and then seeks to add to it. This is certainly something that you would be familiar with. Absolutely. But you're a court of review, and there's nothing in the complaint about conspiracy. Aren't you required to demonstrate to us that there is no way, no way any reasonable person like the judge in this case could conclude that the information the plaintiff seeks to obtain from your client could lead to a further either relevant information to be presented or possibly to amend the complaint? Well, I don't think I have to defend a complaint which hasn't been filed. I simply don't. We're here to deal with what we've been presented with, and that is a fraud case regarding a motel in Springfield and allegations that Mr. Maton made statements, statements that were wrong. Why wouldn't this constitute circumstantial evidence that Mr. Maton were to deny all this, saying, well, why would he do such a thing? Well, his motivation was he had to cover in other regards other activities in the bank. That's why he did what he did here. Why wouldn't that be something which conceivably could be the result of this inquiry? Your Honor, if we're going to do that, what we're going to do is be defending the entire employment history of Mr. Maton at Marine Bank. That's so far afield from what the issues are in this case that there's no way that Judge Diehl at the time of trial, if our motions for summary judgment are denied, would let all that stuff come in. It is, we have several mini-trials within a trial. If we have to defend the entire loan practice history of the Marine Bank during those years. And so in aggressively defending Mr. Maton, as I have to do, I counseled him to object to responding to these questions so that I could bring this before this court. It would be very unfair to require Mr. Maton to make a choice at this point. Since these questions are so improper, his choice is to waive the theft and be potentially subject to criminal prosecution or to invoke the theft and then have the plaintiff improperly seek to draw an adverse inference. Is anything about the Fifth Amendment questioned before us at this time? It is not, Your Honor. Then why are you raising it? I'm simply telling you why this is important to my client because this court has never seen me before on any discovery dispute. And in my 35 years of practicing law, I can only remember two instances, including this one, in which I sought a contempt order because I thought the questions were so improper. And I continue to believe that. Let me go on to state that not only do they have this information already through those detailed exhibits, but Mr. Maton, in connection with the alleged problem that he got involved in, which was discovered in December of 2005, had a person within the bank by the name of Susan Kachurik who was basically, allegedly, moving money around on a particular loan unrelated to the issue in this case. And she was deposed. She testified and cited in my briefs that anything that Mr. Maton had allegedly directed her to do on this other loan had nothing to do with this motel loan. And in addition, the plaintiff's expert witness by the name of Timothy Finn from Kentucky, who testified that he believed fraud and these other problems were present in this case, testified that these allegations relating to Mr. Maton had nothing to do with his view of the case. The plaintiffs in their brief raised the issue of waiver of Fifth Amendment privilege. We have filed a motion to strike that because it is not an issue on appeal. It was not raised by us on appeal. You've raised it several times here in oral argument, counsel. Again, to simply explain to you the importance of this issue to our clients. It's a strange process when you're explaining to us while you're here when no one's asked. I mean, you have a right to appeal. On the one hand, you're saying the Fifth Amendment has nothing to do with anything. On the other hand, you're the one who's raising it. The issue of waiver, Your Honor, is not before you. I'm explaining to you the importance of why I'm here. The issue of waiver is not before this court. It was not ruled upon by Judge Deal one way or the other. There is no cross appeal in the case. And so we would hope that our motion to strike the issue of waiver would be granted. Because, again, this is a court of review and there's nothing for you to review at this point. Judge, the other thing that I will point out is we made our objections on behalf of Mr. Maton based upon the existing complaint at that time. There has since been an effort to amend the complaint. There is pending before Judge Deal, who, as you know, had a heart attack and has been away from the bench for a while.  We filed a motion to strike that amended complaint, as has the other defendant in the case. Basically, the allegations of bank examiner allegations have nothing to do with whether or not the plaintiff was a fraud in connection with the purchase of this hotel. And we think that the Judge Deal got it wrong twice, and that's why we're here. If you disagree with us, then Mr. Maton will need to be opposed again and will need to make the judgment at that time whether he will indulge the Fifth Amendment or not. We would ask that Judge Deal's contempt order be reversed. Thank you, Counsel. Mr. Duray? Is that pronounced correctly, by the way? Anyway, it's... No, no, no, no. Duray, Duray, Dupree... How do you pronounce it? Duray. Duray. Okay, well, I'll do my best, sir. Phil Maton has the burden of proving that he had a valid excuse for violating the court's order ordering him to answer the deposition questions he previously refused to answer. The standard of review is abuse of discretion, and we submit that Judge Deal did not abuse his discretion in holding Philip Maton in contempt for violating the court's order to answer the questions. The background is that from 1998 through after 2003, Marine Bank engaged in an aggressive program to dramatically increase its loan portfolio. We would submit that it at least suggests there was a pump-and-dump kind of arrangement, which is not unusual in the banking industry when a small bank is considering selling out to a larger banking branch. You use that term as if it's supposed to be meaningful to us, or at least to me. It means nothing to me, Counselor. I'll rephrase it. Marine Bank dramatically increased its loan portfolio by making a lot of bad loans. And, for example, over one two-year period, it increased its loan portfolio by something like, I believe the percentage was like 58% when the standard is about 4% per year. Fifty-eight percent of what? Its loan portfolio. Oh, it increased with that? In other words, a dramatic increase. And as part of that process, it made a number of bad loans, including a bad loan that it bought out from Bucey Bank to the Shreome Corporation, which was secured by the motel, the Route 66 motel. At the same time, some of the other bad loans it made were to Randy McAfee and Darren Shipley, or companies that they owned or controlled. This all happened during the same time period. The arrangements with Mr. Valla were made during 2002 and 2003. We do allege in the complaint that there was a pattern of conduct, that the dependents were acting in concert, which is another type of conspiracy claim, and that all of this happened during the same time period. The evidence is that Marine Bank, including Philip Maton, who was the CEO at all times in question, engaged in a number of fraudulent and deceptive practices to conceal the bad loans that were part of the aggressive program to increase the loan portfolio by making misrepresentations and concealments to bank examiners, to the SBA, and to customers of the bank that the bank was attempting to sell the bad property, the properties secured by the bad loans to. And that included the loan and sale in question. The bank actually sold the Route 66 motel to Mr. Valla and his company, then loaned him money for the purpose of the purchase and some $500,000 in improvements he made between the time he signed the contingent purchase contract in September 2002 until he completed the purchase in March of 2003. He was shown an appraisal of $3.5 million and told the motel was worth more than $3.5 million. There are evidences the bank knew that was not true. When he completed the purchase in March of 2003 and made a loan of $2,250,000, which covered the $500,000 in improvements he had done in the interim, he was shown a $5 million appraisal for the property which was needed to justify that loan. What he was not shown is that in the interim the bank had gotten an appraisal for or received an appraisal from Taft Appraisal for $1,900,000 which was not disclosed to Mr. Valla. The loans that were made to McAfee and Darren Shipley were also bad loans. And in order to cover up the fact that there were a series of bad loans, Mr. Maton engaged in what the Deposition Exhibit 19, which I think was filed under seal, describes as an elaborate and complex scheme to hide and pay down a fictitious loan that was once originated from bad loans. Phil Maton was also involved in an elaborate and complex scheme to cover up the bad loan that was made to Shreome Corporation and to then unload the property by misleading Mr. Valla and selling it to him for an inflated price. All of this was happening at the same time period. The deposition questions that he refused to answer are certainly relevant, could certainly lead to the discovery of relevant evidence to show intent to defraud and a pattern of conduct which included the defrauding of Mr. Valla. We would submit to the court that Mr. Maton has not established a valid excuse for not answering the questions, which he has the burden of doing, and that the standard of review is abuse of discretion, which he has also not met, and that the order holding him in contempt should be affirmed. On the waiver issue of the Fifth Amendment, there was a pleading filed, and it's in the record and it's quoted in the response to the motion to strike in paragraph 2, in which the written pleading responding to the motion for contempt clearly suggested, the language was that Mr. Maton, quote, had no choice but to decline to answer questions based on his Fifth Amendment privilege, close quote. So when we argued the motion, I thought he was arguing the Fifth Amendment, and I argued against it. I said he's waived it by not raising it, and then Mr. Kaufman said, I want to make it clear he's not asserting the Fifth Amendment. So at that time, I took him at his word, he was not asserting it, and then on appeal, when he argued, well, the court shouldn't force him into having to take the Fifth Amendment, in our responsive brief, we said, he's waived it. But we were responding to that argument, which in the opening. So what is your position regarding any Fifth Amendment issue before us now? Well, if he says that it's not before you, I don't see how I can say that it is before you, because he's not raising it. But in terms of the argument, don't force me to do it, he's waived it anyway. So I would submit that the contempt order should be affirmed. Thank you, counsel. Mr. Kaufman. Very briefly, the pattern of conduct that he is alleging should result in Mr. Maytime having to respond to the bank examiner allegations is very, very far afield from the issues in this case. Different loans, different parties, different time, unrelated to the Marine Bank loan to the plaintiffs in this case, and a completely different activity. What is comprised of Exhibits 10 and 19 and testimony of other people is allegations that Mr. Maytime was using some money in the bank to make it appear that other unrelated loans were not delinquent or in default. So that was the activity, that moving around money within the bank allegedly to make loans appear to be still valid. How would he generate money from moving funds around? The allegations, again, Judge, are that there were some monies within the bank, say for non-sufficient funds and some other charges, if you will, for the bank that generated some income that he allegedly directed to Susan Kaczurek to use that generated fund in that account to allocate it over to a different loan. That's where the money... Well, would there be a connection? Let's assume there's a global conspiracy here, okay? Would there be some connection of your client bumping up the price for the Route 66 motel beyond what its true value was in order to generate additional income to cover the other bad loans? The short answer to that is no. Because believe me, the plaintiffs and their experts have been all over the particular loan involved in this case and have followed the money, if you will. And no money generated from the Marine Bank transfer or purchase has been moved around, if you will, to make other loans look non-delinquent. So that's really why I'm trying to keep the case focused on the allegations about what Mr. Maton and others said to the plaintiffs. Again, we maintain it's a completely different activity. And I think the questions are improper, designed to harass and intimidate Mr. Maton. And I would ask that the contempt over a judge deal be reversed. Okay, thank you, counsel. We'll take this matter under advisement and be in recess for a few moments.